RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

COUNTY EMERGENCY COMMUNICATIONS DISTRICT
(16-5149); BRADLEY COUNTY EMERGENCY
COMMUNICATIONS DISTRICT (16-5150); BLOUNT
COUNTY EMERGENCY COMMUNICATIONS DISTRICT
(16-5151); BEDFORD COUNTY EMERGENCY
COMMUNICATIONS DISTRICT (16-5152); COFFEE
COUNTY EMERGENCY COMMUNICATIONS DISTRICT
(16-5153); ROANE COUNTY EMERGENCY
COMMUNICATIONS DISTRICT (16-5154); FRANKLIN
COUNTY EMERGENCY COMMUNICATIONS DISTRICT
(16-5155); GILES COUNTY EMERGENCY
COMMUNICATIONS DISTRICT (16-5156); CHEATHAM
COUNTY EMERGENCY COMMUNICATIONS DISTRICT
(16-5157); KNOX COUNTY EMERGENCY
COMMUNICATIONS DISTRICT (16-5158),

          *Plaintiffs-Appellants*,

    *v.*

BELLSOUTH TELECOMMUNICATIONS LLC, dba
AT&T Tennessee,

          *Defendant-Appellee*.

Nos. 16-5149/5150/5151/5152/
5153/5154/5155/5156/5157/5158

_____

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
Nos. 1:11-cv-00330; 1:12-cv-00003; 1:12-cv-00056; 1:12-cv-00131;
1:12-cv-00138; 1:12-cv-00139; 1:12-cv-00149; 1:12-cv-00166;
1:12-cv-00176; 1:12-cv-00186—Curtis L. Collier, District Judge.

Argued: September 14, 2016

Decided and Filed: March 24, 2017

Before: BATCHELDER, MOORE, and COOK, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Frederick L. Hitchcock, CHAMBLISS, BAHNER & STOPHEL, P.C., Chattanooga, Tennessee, for Appellants.  Scott H. Angstreich, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellee.  **ON BRIEF:**  Frederick L. Hitchcock, Willa B. Kalaidjian, CHAMBLISS, BAHNER & STOPHEL, P.C., Chattanooga, Tennessee, for Appellants.  Scott H. Angstreich, Jeremy S. Newman, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellee.  Kate Comerford Todd, Steven P. Lehotsky, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., Jonathan G. Cedarbau, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Brook Hopkins, Sameer Ahmed, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Misty Smith Kelley, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Chattanooga, Tennessee, Gregory L. Skidmore, KIRKLAND & ELLIS LLP, Washington, D.C., for Amici Curiae.

BATCHELDER, J., delivered the opinion of the court in which COOK, J., joined, and MOORE, J., joined in part.  MOORE, J. (pp. 24–26), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   In this diversity action, the plaintiff municipal corporations operate the local "emergency communications" or "911" programs in their respective counties; specifically, the call centers that receive and route the 911 emergency calls to the proper emergency responders (e.g., police, fire, ambulance).  They allege that the defendant telephone company—to reduce costs, offer lower prices, and obtain more customers— engaged in a covert practice of omitting fees mandated by Tennessee statute, and they seek compensation under that statute.  They also allege that, while concealing this practice, the telephone company violated the Tennessee False Claims Act.  The defendant telephone company moved to dismiss the first claim, arguing that the statute contained no implied private right of action. The district court agreed.  The telephone company then moved for summary judgment on the second claim, arguing that its statements were not knowingly false.  The district court agreed again, ending the action. When the plaintiffs appealed, we consolidated their appeals and, finding

that the district court erred in both the dismissal and the summary judgment, we REVERSE both judgments and REMAND for further proceedings consistent with this opinion.

## I.

In 1984, Tennessee passed its Emergency Communications District Law (hereinafter the "911 Law"), Tenn. Code Ann. (T.C.A.) § 7–86–101 *et seq.*, to formally establish 911 as the primary emergency telephone number for all Tennessee residents.[1]   The 911 Law created municipal corporations for each county, i.e., Emergency Communications Districts ("Districts"), to run the 911 programs, specifically including the call centers that receive and route the 911 emergency calls to the proper emergency service.  *Id*. at §§ 104 to 107.  To support these functions, the 911 Law empowers the Districts to levy a charge (the "911 charge") on telephone users' phone lines.  *Id*. at § 108(a).  Correspondingly, the 911 Law compels a telephone "service supplier" such as BellSouth to bill and collect these 911 charges from their "service users."[2]  *Id*. at § 108(d).   The 911 Law completes the loop by ordering the service suppliers (phone companies) to report and remit the 911 charges to the Districts.[3]  *Id*. at § 110(a).

Beginning in 2011, several Districts sued BellSouth to recover tens of millions of dollars in 911 charges that they believe BellSouth should have billed, collected, and remitted.  They sought recovery on multiple theories, three of which persist to appeal.  The Districts sought to recover directly under the 911 Law, but the district court dismissed that claim, holding that the 911 Law does not provide a cause of action against service suppliers such as BellSouth. *Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecomms., LLC (Hamilton I)*, 890 F.

---

[1]On April 25, 2014, the governor of Tennessee signed into law a sweeping overhaul of the 911 Law, titled "911 Funding Modernization and IP Transition Act of 2014," 2014 Tenn. Pub. Acts 795.  This Act repealed and replaced the 911 Law at issue here, such that many of the statutory provisions cited herein have been deleted or relocated within the Tennessee Code.  This opinion hereafter refers only to the old version of the statute; i.e., the "911 Law."

[2]Simply put, a "service supplier" is a phone company, i.e., "any person, corporation or entity providing exchange telephone service to any service user."  T.C.A. § 7–86–103(14).  A "service user" is a phone company's customer, i.e., "any person, corporation, or entity that is provided 911 service."  *Id*. at § 103(15).

[3]The service suppliers may also charge the Districts on a per line basis for administration and operation of the 911 lines but, while that aspect has been occasionally referenced in this case, it is not a material issue.

Supp. 2d 862, 876 (E.D. Tenn. 2012).[4]  The Districts also sought to recover for a breach of fiduciary duty under an agency construct, but the court granted summary judgment to BellSouth, finding a lack of control and an "arm's-length business relationship," not an agency relationship with fiduciary obligations.[5] *Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecomms., LLC (Hamilton II)*, 154 F. Supp. 3d 666, 692 (E.D. Tenn. 2016).  Finally, the Districts sought recovery via the Tennessee False Claims Act (TFCA), T.C.A. § 4-18-101 *et seq.*, but the court held that BellSouth's interpretations of the 911 Law were sufficiently reasonable and the Districts could not demonstrate "falsity" under the TFCA.  *Id.* at 700.

## II.

Our review in this appeal is de novo.  *See Hogan v. Jacobson*, 823 F.3d 872, 883 (6th Cir. 2016); *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015).

## A.

The Districts contend that the district court erred by holding that the 911 Law implies no private right of action, arguing that the court overlooked Tennessee Code § 1-3-119(c)(4) and misapplied *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850 (Tenn. 2010).  The district court relied on *Brown* and, after acknowledging that the 911 Law contained no *express* right of action against service suppliers (phone companies), accurately recited *Brown*'s three-factor inquiry into "whether the legislature intended for such a right to be implied":

> (1)    whether the party bringing the action is an intended beneficiary within the protection of the statute,
>
> (2)    whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and

---

[4]The ten appeals here came from a single, consolidated case in which the district court first consolidated the ten separate district court cases, each with its own docket and case number, on a joint motion by the parties for the limited purpose of deciding the motion to dismiss (6/5/12).  Shortly after granting that motion in part (8/20/12), the district court designated the Hamilton County case as the lead case, but acknowledged that the cases were not consolidated (9/26/12).  Eventually, the district court formally consolidated the cases "per chambers" (10/7/15), though without a formal motion or order, and issued a single opinion and final judgment.  All ten plaintiffs appealed that judgment and we consolidated those ten appeals on a joint motion by the parties (2/26/16).

[5]In this appeal, the Districts have abandoned their "confidential relationship" theory of agency, which gave rise to the district court's finding of an "arm's-length business relationship."  Therefore, we do not address it.

> (3)    whether implying such a remedy is consistent with the underlying purposes of the legislation.

*Hamilton I*, 890 F. Supp. 2d at 874 (formatting modified) (quoting *Brown*, 328 S.W.3d at 855 & n.4 (relying on *Cort v. Ash*, 422 U.S. 66, 78 (1975), which had conceived these factors in the federal context)).   The district court answered "no" to each query, announcing that: (1) the Districts were not the intended beneficiaries, *id*. at 875 (i.e., "the actual beneficiary of the statute is the public" and "[a]lthough [a District] is the conduit through which the public receives 911 service, it is not the actual beneficiary"); (2) "it is highly likely the Tennessee legislature did not intend to create such a right of action" given that "the [911] Law explicitly provides that legal action can be taken against service users [but does not include a similar provision for][6] service suppliers," *id*.; and (3) "the primary purpose of the [911 Law] is to establish a uniform emergency number for the public" not to "ensur[e] service suppliers properly bill, collect, and remit 911 charges," *id*. at 876 (touting the applicability of "other available remedies," unspecified).

Brown warrants some further examination before we proceed.   The question in *Brown* was whether the Tennessee Title Pledge Act (TTPA)[7] implied a private right of action by a borrower against a lender who violated the TTPA by charging excessive interest or unauthorized fees.   *Brown*, 328 S.W.3d at 853.   In conducting the three-query analysis (*supra*), the Tennessee Supreme Court found that (1) the borrowers were the intended beneficiaries, but that neither the (2) legislative intent nor the (3) underlying purpose supported a private right of action.   *Id*. at 858-61.   In its analysis, the *Brown* court returned repeatedly to the fact that the TTPA had specific, express enforcement provisions, operating "entirely through criminal and administrative penalties" (e.g., criminal misdemeanor prosecution and license suspension).   *Id*. at 857-60.   And these governmental-enforcement provisions took on added importance with the court's

---

[6]The actual, unedited quote says that the 911 Law "explicitly provides that legal action can be taken against service users but not service suppliers," *Hamilton I*, 890 F. Supp. 2d at 875 (referring to T.C.A. § 7-86-110(c)), which could be misread as an assertion that the 911 Law says explicitly that *legal action cannot be taken against service suppliers*.  But the 911 Law says nothing at all about the right to take legal action against service suppliers. The bracketed replacement language is to avoid any such misreading.

[7]The Tennessee Title Pledge Act, T.C.A. § 45-15-101 *et seq.*, governs "title pledge transactions," in which a borrower secures a short-term loan in exchange for a security interest in the title to his or her motor vehicle.

proclamation that "where an act as a whole provides for governmental enforcement of its provisions, we will not casually engraft means of enforcement of one of those provisions unless such legislative intent is manifestly clear." *Id*. at 857 (editorial marks omitted) (quoting *Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc.*, 978 S.W.2d 91, 94 (Tenn. 1998)); *see also Am. Heritage Apts., Inc. v. Hamilton Cty. Water & Wastewater Treatment Auth.*, 494 S.W.3d 31, 52 (Tenn. 2016) (adopting the underlying court's reasoning to hold that Tennessee's Wastewater Treatment Authority Act, T.C.A. § 68-221-601 *et seq.*, creates a private right of action (citing *Am. Heritage Apts., Inc. v. Hamilton Cty. Water & Wastewater Treatment Auth.*, No. E201400302COAR3CV, 2015 WL 399215, at *10 (Tenn. Ct. App. Jan. 30, 2015), which emphasized the absence of any administrative remedy and applied the *Brown* factors)).[8]

The 911 Law here, however, contained no such governmental-enforcement provisions against a service supplier; no express criminal sanctions for even the most wanton violation, no means of imposing any administrative penalty, no governmental oversight at all, in fact. *See* T.C.A. § 7-86-110. The 911 Law provided the Districts with no "other" remedy, no other means of enforcing the 911 Law's provisions against the service supplier (i.e., of compelling BellSouth to bill, collect, and remit the 911 charges), and no other means of penalizing a service supplier

---

[8]In *Hardy v. Tournament Players Club at Southwind*, -- S.W. 3d --, No. W2014-02286-SC-R11-CV, 2017 WL 922482, (Tenn. Mar. 8, 2017), the Tennessee Supreme Court recently held that the "Tip Statute" provision of the Tennessee Wage Regulation Act, T.C.A. § 50-2-107, does not imply a private right of action by a waitress whose employer had collected her tips from her customers but withheld them from her, in violation of the statute. In so doing, the court applied the analysis from *Brown* and referred numerous times (as many as 15 times) to the statute's inclusion of governmental enforcement provisions and the proposition that such inclusion implies a legislative intent to deny a private right of action. The decision's ultimate purpose, however, was to overrule a longstanding appellate case, *Owens v. University Club*, No. 02A01-9705-CV-00103, 1998 WL 719516 (Tenn. Ct. App. Oct. 15, 1998), and reject the "doctrine of legislative inaction" as a means of finding a private right of action in the Tip Statute by "presum[ing] that the legislature knew of the Court of Appeals' holding in *Owens*." *Id*. at *15.

One part of the *Hardy* opinion perhaps warrants specific mention here. As part of its analysis of Tennessee's legislative-inaction doctrine, the court announced that "Tennessee Code Annotated section 1–3–119 (a)-(b) provides that legislation must contain express language to create or confer a private right of action under a statute, and that no court may construe a statute to impliedly create a private right of action in the absence of such language," but then recognized an exception under § 1–3–119(c)(1), for "prior judicial decisions" "in which a court (prior to the effective date of the statute) ha[d] recognized such a private right of action." *Hardy*, 2017 WL 922482 at *14. The present case falls within a different exception, § 1–3–119(c)(4): "[A court may] [r]ecognize a private right of action commenced by a state or local governmental entity to collect any fees owed for a governmental service or to recover such fees from a party that is obligated to bill and collect fees owed others for a governmental service." Thus, neither the language nor the reasoning of this part of *Hardy* affects the present case.

for failing to do so.   This absence of any other enforcement provision in the 911 Law is a consummate distinction from the TTPA statute in *Brown*.

Therefore, in considering the district court's application of *Brown*'s three-part inquiry to the 911 Law, we begin with the importance *Brown* placed on the TTPA's governmental-enforcement provisions when analyzing the "underlying purpose" factor: the 911 Law, unlike the TTPA, has no comprehensive regulatory system, no enforcement provisions, no "Commissioner" or overseer with "broad enforcement authority," and no prescribed penalties for violation.[9]

The district court also deviated from *Brown* in two significant ways.   After stating *Brown*'s three-part inquiry clearly and accurately, *Hamilton I*, 890 F. Supp. 2d at 874, the court altered two of those factors, converting the first factor's "an" intended beneficiary, *Brown*, 328 S.W.3d at 855, into a requirement that the plaintiff be "the" only intended beneficiary; and converting the third factor's "consistent with the underlying purposes," *id*., into a limitation that the charge at issue be the statute's "primary purpose."   The court's conclusion that the Districts could not satisfy the factors, and that the 911 Law did not imply a private right of action, inescapably relies on these modifications to the factors.  *See Hamilton I*, 890 F. Supp. 2d 875 ("*the* actual beneficiary of the statute is the public" and "[a]lthough [a District] is the conduit through which the public receives 911 service, it is not *the* actual beneficiary" (emphasis added)); *id.* at 876 ("the *primary purpose* of the [911 Law] is to establish a uniform emergency number for the public" not to "ensur[e] service suppliers properly bill, collect, and remit 911 charges" (emphasis added)).   Our reading of *Brown* is, therefore, different from the district court's, which drastically affects the following analysis, given that we review this issue de novo.

---

[9]The Tennessee Regulatory Authority (TRA) and Tennessee Emergency Communications Board (TECB) did give the Districts a regulatory ability to negotiate an audit of each District's largest service supplier, such as BellSouth.  *See* Tenn. Comp. R. & Regs. 1220-04-08-.13(2)(g) ("For a period of four (4) years from June 6, 1995, . . .within each Emergency Communications District, the Incumbent Enhanced 911 Emergency Service Provider shall . . . [b]ill, collect and remit the Enhanced 911 fees associated with its subscribers … to the appropriate Emergency Communications District …; and [] provide a mutually agreeable means of auditing the subscriber base by number and type by the Emergency Communications District auditor.") (expired June 6, 1999); Tenn. Comp. R. & Regs. 1220-04-08-.13(4) ("After June 6, 1999, the incumbent Enhanced 911 Service Provider or the dominant Local Telecommunications Service Provider within an ECD territory shall be required to offer Enhanced 911 service as provided for in Paragraph (2) above," presumably including audits.).  But this was not a regulatory overseer.

On de novo review, we must decide whether the Tennessee legislature intended the Districts to have a private right of action against a service supplier such as BellSouth under the 911 Law, based on the three-factor inquiry set out in *Brown*, 328 S.W.3d at 855.

**1. Intended Beneficiary:** "whether the party bringing the cause of action is an intended beneficiary within the protection of the statute." *Id.* The Districts assert that a statute can intend multiple beneficiaries and that the 911 Law does just that, intending the general public as the ultimate beneficiary of the 911 program overall but the Districts as the specific beneficiary of the provisions ordering the service suppliers to bill, collect, and remit the money to the Districts. Stated another way, the general public is the direct beneficiary of the Districts' operating the 911 program (and the 911 Law's provisions that order the Districts to do so), whereas the Districts are the direct intended beneficiary of BellSouth's billing, collecting, and remitting of the 911 charges (and the 911 Law's provisions that order BellSouth to do so).

BellSouth argues that "the 911 Law did not confer upon the [Districts] a *benefit*; it imposed upon them a *duty* to protect the public," meaning that the Districts merely fill a "functional role"; and even if the Districts "'may benefit' in a secondary way" or receive a "residual benefit," that is insufficient to make them an intended beneficiary. [Appellee Br. at 21-22.] The Districts answer that it is because the 911 Law commands them (i.e., imposes a "statutory responsibility" upon them) to operate the 911 program that "[t]hey are the principal beneficiary of the 911 Charge revenue that BellSouth is required to properly bill, because they cannot fulfill their statutory responsibilities without that revenue." [Apt. Reply Br. at 9.]

The 911 Law created a scheme in which the Districts' funding is utterly dependent on BellSouth's proper billing, collecting, and remitting of the 911 charges; therefore, the Districts' very existence depends on BellSouth's proper compliance with the 911 Law. But BellSouth is not reciprocally beholden to the Districts in any way. These two entities are not collaborators or partners, they are wholly unrelated and independent but for this one thing. Each performs its ministerial functions as the 911 Law commands, and each receives only as the 911 Law bestows. The 911 Law commands BellSouth to bill, collect, and remit the 911 charges and it bestows that

money on the Districts.  This scheme, which makes the Districts so inescapably dependent on BellSouth, also makes the Districts an intended beneficiary of BellSouth's obligations.

    **2. Legislative Intent:** "whether there is *any* indication of legislative intent, express *or implied*, to create or deny the private right of action."  *Brown*, 328 S.W.3d at 855 (emphasis added).  The Districts propose three indications of legislative intent, beginning with Tennessee's stand-alone "Private Right of Action" statute:

> [A court may] [r]ecognize a private right of action commenced by a state or local governmental entity to collect any fees owed for a governmental service or to recover such fees from a party that is obligated to bill and collect fees owed others for a governmental service.

T.C.A. § 1-3-119(c)(4) (enacted July 1, 2012).  This fits our facts: the Districts are municipal entities, seeking to recover from BellSouth, a party obligated to bill and collect fees for the 911 program, a governmental service.[10]  But as BellSouth explains, this provision "says only that a court *may* (not must) find an implied right of action"; the district court properly exercised its discretion in deciding whether to find a private right of action pursuant to Tennessee law (*Brown*); and therefore, this provision does not contravene the district court's decision.  And as an indication of legislative intent, it is equally conflicted.  This statute, enacted in 2012, does not speak to the legislature's intent when it enacted the 911 Law 28 years earlier.  On the other hand, it does speak to the present state of mind of the Tennessee legislature.

    Next, the Districts—attempting to analogize an Alabama case under Alabama law—also point to the fact that the 911 Law created each District as "a 'municipality' or public corporation in perpetuity," T.C.A. § 7-86-106, and Tennessee law empowers municipal corporations with the inherent right to sue, *see Bd. of Park Comm'rs v. City of Nashville*, 185 S.W. 694, 700 (Tenn. 1916).  But that reasoning does not extend so far as to provide that the Districts' right to sue includes the specific right to sue BellSouth under the 911 Law.  *See, e.g., Abel v. Welch*,

---

[10]In their appellate brief, the Districts discuss some legislative history from the committee meeting on this statute's Senate Bill, to the effect that this provision was intended specifically for their benefit.  [Apt. Br. at 17-18.]  But as BellSouth replies, this history is vague at best and hardly compelling, let alone determinative.

315 S.W.2d 268, 270 (Tenn. 1958).  And neither the Alabama case nor the Alabama law speaks to the Tennessee legislature's intent when enacting the Tennessee 911 Law in 1984.

Finally, the Districts point to the last provision in § 110, which states: "Good faith compliance by the service supplier [phone company] with the provisions of this chapter shall constitute a complete defense to any legal action or claim against the service supplier arising in connection with this part."  T.C.A. § 7-86-110(e).  The Districts argue that this good-faith-defense provision necessarily anticipates that phone companies would be sued, implying some legislative intent—or at least expectation—of a private cause of action against them.  BellSouth reasserts the district court's conclusion that this good-faith-defense provision was likely intended to defend against only countersuits by customers whom BellSouth might have sued to enforce the 911 charge:

> [T]his defense was included in the same section [§ 110] as the provision authorizing the service supplier 'to demand payment from any service user who fails to pay any proper service charge' and to 'take legal action, if necessary, to collect the service charge from the service user.' § 110(c).  Hence, one logical interpretation of the good faith defense, read together with the aforementioned provision, is that the statute protects the service supplier in the event a service user takes legal action against it when acting pursuant to [§ 110(c)].

*Hamilton I*, 890 F. Supp. 2d at 875-76 (citation form modified).  While this is a reasonable speculation, it begs a counter speculation because this defense was *also* included in the same section (§ 110) as the provision ordering the service supplier (phone company) to remit the 911 charges to the Districts, § 110(a) ("The service supplier shall remit the funds collected as the service charge to the district every two (2) months. Such funds shall be remitted to the district no later than thirty (30) days after the last business day of such two-month period.").  Hence, another "logical interpretation" of the good-faith-defense provision—which says, "shall constitute a complete defense to *any* legal action or claim against the service supplier *arising in connection with this part* [§ 110]," *id*. at § 110(e) (emphasis added)—is that it protects the service supplier (phone company) in the event a District sues it for violating § 110(a).  Obviously, the legislature might have intended one or the other or both (or neither) of these speculations, but we need not speculate or choose from among these possibilities.

BellSouth presses the district court's other finding of legislative intent, which was that the 911 Law granted the Districts an express right of action against the service users (telephone customers), T.C.A. § 7-86-110(c), but omitted any corresponding express right of action against service suppliers (phone companies), implying—through this exclusion—an intent to deny the Districts a private right of action against the phone companies. To be sure, such a scenario can be, and often is, read as an indication of legislative intent, but this is not an overpowering inference.

All told, we do not find a compelling indication one way or the other of legislative intent either to create or deny the private right of action. We can call this factor a draw.

**3.   Underlying Purpose:** "whether implying such a remedy is consistent with the underlying purposes of the legislation." *Brown*, 328 S.W.3d at 855. The 911 Law's professed purpose was "the establishment of a uniform emergency number to shorten the time required for a citizen to request and receive emergency aid," T.C.A. § 7-86-102(a), via three conceptual parts. The statute:

(1)   established the three-digit number "911" as the universal emergency telephone number, *id*. at §§ 102(a), 107(c);

(2)   authorized the county governments to create the Emergency Communications Districts to administer the 911 program, *id*. at §§ 104-07; and

(3)   provided a broad array of funding, §§ 108-51, which therein ordered and empowered the phone companies to bill and collect fees from their customers and remit those funds to the Districts, *id*. at §§ 108(d), 110(a), 110(c).

The statute does not authorize the Districts to obtain payment directly from telephone customers.

Each of the three parts is equally necessary or important. A "uniform emergency number" is insufficient all by itself to shorten the time for a citizen to request and receive emergency aid; that number must connect the caller to a call-center employee who can dispatch an emergency responder; and funding is necessary to build, staff, operate, and maintain that call center, as well as the rest of the 911 program. Hence, "[t]he general assembly f[ound] also that

the continued viability of the lifesaving 911 emergency communications service is of the highest priority for the health and safety of the citizens of Tennessee." *Id*. at § 102(b)(1).

Not to belabor the point, as we have already analyzed this in the "Intended Beneficiary" section, *supra*, but the 911 Law created a particular scheme in which the Districts' funding is entirely dependent on the service suppliers' proper billing, collecting, and remitting of the 911 charges; hence, the Districts' *continued viability*—indeed, their very existence—necessarily depends on BellSouth's proper compliance with the 911 Law. It is therefore fully consistent with the underlying purpose that the Districts have a means of compelling BellSouth to properly bill, collect, and remit the 911 charges in accordance with the 911 Law. Moreover, because the 911 Law contains no other regulatory system, governmental overseer, criminal or administrative enforcement provisions, or express penalties for violation, the Districts' most expedient and effective means of compelling the phone companies is a private right of action.

We conclude that the 911 Law implies a private right of action by the Districts against a service supplier such as BellSouth to effectuate its requirements and serve its purposes. We REVERSE the district court's conclusion to the contrary and its dismissal of this claim.

**B.**

The Districts also appeal the district court's rejection of their agency theory. They contend that BellSouth was their agent for purposes of billing, collecting, and remitting the 911 charges and, therefore, owed them a fiduciary duty. In denying that Bellsouth was their agent, the determinative factor to the district court was whether one party (the Districts as principal) had the right to control the actions of another (BellSouth as agent), and the extent of that control. *See Hamilton II*, 154 F. Supp. 3d at 688. The court found a reciprocal relationship in which the Districts did not have sufficient control over BellSouth to establish an agency relationship.

We disagree with the district court's basic view of the relationship. These two parties were *not* engaged in an autonomous or reciprocal relationship; they were "captive" co-participants in the 911 program under the 911 Law. Each acted independently under express

statutory mandate.  The only "relationship" was that dictated by the 911 Law, which empowered the Districts to seek funding from BellSouth and ordered BellSouth to provide it.  There was no negotiation between them, no contract, no business transaction, and no reciprocation.  The Districts could not fire BellSouth and hire someone else to collect the 911 charge, or collect the 911 charge themselves.  BellSouth could not demand better compensation, petition the Districts for better terms or conditions, or even quit.

This peculiar relationship fundamentally affects the determination of agency.  The district court relied on two cases for its extent-of-control approach: *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 723 (Tenn. 2000) (a respondeat superior case in which the question was whether the principal drug store was liable for the tortious conduct of its de facto agents, off-duty police officer security guards), and *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009) (a personal jurisdiction case in which the question was whether one company was the agent of another for imputing jurisdiction).  On appeal, the Districts do not dispute whether control is the determinative factor, but merely insist that they had sufficient control (i.e., ordered implementation of the 911 charge, when to begin, and how much to charge).

But this is not a case in which the parties may (or may not) have created agency between themselves by their agreement or actions, *see Gordon*, 300 S.W.3d at 653, *White*, 33 S.W.3d at 723.  As we just explained, these parties had neither an agreement nor even the authority to negotiate one.  The present agency relationship (if it is such) was not created by the participants, it was created by the State, via statute, namely, the 911 Law, which would also define the scope of such agency.  Hence, the "extent of control" in this case is not a function of the parties or their actions (actions as to which the statute gave them no flexibility or discretion).  Rather, the 911 Law fully and exclusively dictated the extent of control.  The determinative analysis is not a measure of the Districts' authority or exercise of control; it is just statutory interpretation.

The 911 Law does not create an agency relationship expressly and the "control" it gives the Districts is both minimal and limited.  But, recognizing that "[i]n its broadest sense, the concept of agency includes every relation in which one person acts for or represents another," *White*, 33 S.W.3d at 723 (quotation marks omitted), one might interpret the 911 Law as

implicitly making the service supplier (BellSouth) the Districts' *de facto* agent for the limited purpose of billing, collecting, and remitting the 911 charge.  In that role, the service supplier would have a fiduciary duty to bill, collect, and remit the charge in accordance with the 911 Law. Such an interpretation would permit the Districts to sue for breach of fiduciary duty.

We are aware that the plaintiff is the master of the complaint and may proceed on its preferred cause of action, but we are also aware that the Districts raised this agency-based action only after and because the district court held that the 911 Law afforded them no statutory private right of action.  *See Gen. Ins. Co. of Am. v. Lamar Corp.*, 482 F.2d 856, 859 (6th Cir. 1973) ("When a statute provides a beneficial right but no civil remedy for its securance, the common law on its own hook provides a remedy, thus fulfilling [the] law's pledge of no wrong without a remedy."  (quotation marks and citation omitted)).

In the present context, however, in which we have already held that the 911 Law gives the Districts an implied private right of action, *see* § II.A., *supra,* an additional finding that the 911 Law also implies an agency relationship for the limited purpose of billing, collecting, and remitting the 911 charge, and an associated fiduciary duty, would afford the Districts nothing more than they already have—the right to sue BellSouth for its failure to bill, collect, and remit the 911 charge under the 911 Law.  There is no need here for a common law remedy to protect an unprotected statutory right.  There is no need to construe the statute as implying agency so as to create a fiduciary cause of action when we have already construed the statute as implying a virtually identical statutory cause of action.  In other words, the Districts' private statutory right of action would redress the identical claim the Districts would raise in a breach of fiduciary duty action under this unique and limited construction of agency and is therefore unnecessary.

**C.**

Finally, the Districts appeal the grant of summary judgment to BellSouth on their action under the Tennessee False Claims Act (TFCA), T.C.A. §§ 4-18-101 to 108, contending that the district court: (1) misunderstood their TFCA claim, (2) misconstrued the intent behind BellSouth's monthly and annual reports, (3) ignored all the unbilled lines for which BellSouth had no explanation, (4) improperly inserted a "bad faith" requirement into the analysis, and

(5) decided material factual disputes in accepting BellSouth's interpretations of the 911 Law as "reasonable" explanations for the unbilled lines.  We address each of these contentions in turn.

**1. TFCA Claim.**  The Districts' TFCA claim was based on BellSouth's monthly and annual reports, in which BellSouth asserted that it had billed all the lines it was required to bill. *See Hamilton II*, 154 F. Supp. 3d at 692-93 ("BellSouth represented in each of its monthly reports submitted to the Districts along with its remittances that 'in accordance with the Tennessee Legislature, BellSouth has billed and collected [911 Law] Surcharges as stated below.'" (editorial mark and footnote omitted)).  The Districts' rather simple TFCA claim was that these statements were false, such that BellSouth had knowingly made, used, or caused to be made or used a false statement to conceal, avoid, or decrease its obligation to transmit money to the Districts (i.e., political subdivisions of the State), in violation of T.C.A. §4-18-103(a)(7).

The district court construed this as a "false certification theory" claim, which—it stressed as *"[i]mportantly"*—"only applies where the underlying regulation is a 'condition of payment,'" *Hamilton II*, 154 F. Supp. 3d at 696 (emphasis added), meaning, presumably, that a District could not have approved BellSouth's payment as satisfied without BellSouth's presenting a certification of compliance with the 911 Law, *see id*. But the 911 Law did not require such approval, and certification of compliance was not a "condition of payment."  Instead, the "certification" was gratuitous.  Nevertheless, from this premise, the court summarized its task:

> *Assuming BellSouth was certifying compliance*, the [c]ourt must determine whether there were in fact legitimate grounds for the disagreement.... The Districts' evidence must at least show that BellSouth's reading [wa]s so unreasonable that [BellSouth's] arguments could not have been made in good faith and thus no legitimate grounds for disagreement existed.

*Hamilton II*, 154 F. Supp. 3d at 697 (citations, editorial marks, and quotation marks omitted; emphasis added).  Because the court announced that it was beginning with the assumption that "BellSouth was certifying compliance," we must conclude that this assumption had some effect on the construction of the test that followed from it.  This is an error compounding itself.

The Districts did not assert a strict "false certification theory"; they simply asserted that BellSouth had knowingly used false statements to conceal from them that it had not billed (or, therefore, collected and remitted) all of the 911 charges that it was supposed to.

**2. Billing Reports.** Each month, and again annually, when BellSouth remitted to the Districts the 911 fees that it had collected, it attached an accompanying report that said: "In accordance with the Tennessee Legislature, BellSouth has billed and collected [the 911 Law] Surcharges as stated below." *See Hamilton II*, 154 F. Supp. 3d at 692. The Districts said this was a misrepresentation by BellSouth that it had "collected and remitted *all* 911 charges required under the 911 Law," whereas BellSouth said this just reported "the number of lines against which it *actually assessed* a 911 charge." *Id*. at 694 (footnote omitted).

> BellSouth argues that its remittance reports did not certify that it had billed *all* required 911 charges. Its corporate representative . . . states that in both the pre- and post-July 2010 forms, BellSouth was representing only that it billed and remitted the numbers and amounts in the reports, not that it billed and remitted for *all* eligible lines. In other words, when the reports stated 'in accordance with the Tennessee Legislature, BellSouth has billed and collected [911 Law] Surcharges as stated below,' they meant that, pursuant to the 911 Law, BellSouth reported the surcharges 'billed and collected.' That is, the reports represented that, in accordance with the 911 Law's requirement to report all charges billed and collected, BellSouth provided them as 'stated below.'

*Id*. at 694 n.24 (citation and editorial marks omitted; emphasis added). The court concluded:

> [T]he facts are as follows: 1) BellSouth represented that the reports contained a listing of all 911 charges due under the 911 Law; and 2) BellSouth did not include all the lines which the Districts claim should have been billed. This amounts to nothing more than a disagreement over statutory interpretation and is thus insufficient to establish the 'knowing falsehood' element required for TFCA liability. There is no evidence that the reports stated BellSouth was collecting and remitting on lines which it was not.[11] At most, BellSouth and the Districts had different interpretations of the proper approach to [which lines to bill].

---

[11]To be clear, the Districts never accused BellSouth of reporting that it had been "collecting and remitting on lines which it was not [actually collecting and remitting]"; the Districts' accusation was always and only that BellSouth had not billed all the lines that it was supposed to bill.

*Id.* at 700-01.   The Districts contend that the court's construction views the facts and draws inferences so as to misconstrue the intent behind and effect of BellSouth's representation in its reports.

In this appellate review of summary judgment, we do not find facts or limit the finder of fact on remand.   We merely accept the Districts' proffered facts and draw inferences in the Districts' favor, as we must in deciding summary judgment.   Hence, those claims, viewed in the light most favorable to the Districts as the non-moving party, look like this:

> Fact 1: BellSouth represented that the reports contained a listing of 911 charges "in accordance with the Tennessee Legislature" (or as the district court phrased it, "a listing of all 911 charges due under the 911 Law").
>
> Fact 2: The reports did not include all the lines that should have been billed.
>
> Fact 3: The reports did not identify any of the lines that BellSouth had chosen not to bill based on its statutory interpretation; moreover, the reports did not reveal that BellSouth had engaged in any statutory interpretation to omit lines.
>
> Fact 4: The reports did not identify any of the lines that BellSouth had not billed without explanation.
>
> Fact 5: The reports did not identify any lines at all that had not been billed; the reports presented only lines that had been billed and none that had not been billed.
>
> Inference 1: BellSouth represented that the reports contained a listing of every telephone line in that county subject to 911 charges under the 911 Law, omitting none, and correspondingly listed the resulting 911 fees from all of those lines, as properly billed, collected, and remitted under the 911 Law.
>
> Inference 2: There was no basis for disagreement over statutory interpretation inasmuch as the Districts were wholly unaware that BellSouth was omitting lines or that it was engaging in statutory interpretation to justify the omission of lines.
>
> Inference 3: The purpose of beginning each report with that statement was to mislead the Districts into believing that BellSouth was billing all the lines (or at least to pacify the Districts and avoid any such questions), so as to conceal that it was not billing some lines and not collecting all the charges it should have.
>
> Inference 4: BellSouth's contention that this is merely a disagreement over statutory interpretation is an after the fact rationalization, disproven by the simple fact that BellSouth concealed (or at least did not disclose) any of this earlier.

We agree with the Districts that, at least for the purpose of surviving summary judgment, they have alleged and supported an actionable misrepresentation by BellSouth.

**3.    Unexplained Unbilled Lines.**    The Districts contend that they have presented a genuine issue of material fact concerning the "gap" between the number of lines on which BellSouth *should have* billed and the far fewer lines on which BellSouth *actually* billed.    They contend that the district court overlooked or omitted some undetermined number of lines when it accepted BellSouth's assertion that the lines all fall into one of five categories "for which BellSouth does not believe it is required to bill and remit 911 charges under the 911 Law," *Hamilton II*, 154 F. Supp. 3d at 693.    The Districts insist that a number of lines did not fall into those five categories—unbilled lines for which BellSouth offered no explanation—and there was no interpretive dispute concerning their billing, legitimate or otherwise.    The Districts contend that, at a minimum, this TFCA claim survives for these unexplained unbilled lines.

When the Districts sued in November 2011, accusing BellSouth of failing to bill all of the lines it should have, that claim put 120 months of billings into dispute based on the 10-year statute of limitations.    Early in discovery, the Districts sought to quantify the lines that had been billed and those that had not (as well as which lines should or should not have been, and why). BellSouth answered that it did not know how many lines it had, how many were billed, or how many were not.    It denied the Districts' discovery demands on that basis.    Eventually, BellSouth hired an outside expert to investigate and prepare a report (hereinafter the "Report" (11/15/13) [R. 259-1]).    Using data from 11 selected months between December 2009 and February 2013, the expert concluded—as the district court put it—"that BellSouth correctly identified eligible lines 99.4% of the time and that BellSouth billed and remitted 911 charges on 100.26% of those eligible lines," *Hamilton II*, 154 F. Supp. 3d at 694 (citing the Report, ¶¶ 11-15, 107-08).

That is, BellSouth's own paid expert found that BellSouth omitted at least 0.5% of the lines without explanation.    Given the total volume of lines in any given county, this could be thousands of lines and thousands of dollars per month.    Nor does BellSouth's attorney assert on appeal that it billed every line that it was supposed to bill even under its version of what it was supposed to bill; at best it billed "the overwhelming majority" or "virtually all."    [Ape. Br. at 51, 52.]    And, while arguing the summary judgment motion before the district court, at one point BellSouth's attorney put it this way: "[W]e never claimed, Your Honor, that BellSouth's billing

was perfect. This is not a case about whether Bell[S]outh's billing was perfect." [R. 323, 39:9-12]   During an earlier exchange, however, when the Districts' attorney was discussing the Report's data, the district court had asked: "I take it from looking at the chart [in the Report] that there were no instances, at least in earlier years of more [money] being remitted [to the Districts] than should have been?" [R. 323, 34:7-9]  The Districts' attorney answered, without objection or clarification from BellSouth: "None at all, Your Honor. This is BellSouth's own analysis. In the early years before we filed suit, not a single month in a single district [was there ever more money remitted to the Districts than should have been]." [R. 323, 34:10-12] So, while BellSouth's billing wasn't perfect, it never once managed to err accidentally in the Districts' favor.

The Districts contest several aspects of the Report, to be sure, but also argue that even taken at face value the Report actually proves their claim of numerous unexplained unbilled lines. For one thing, the Report itself demonstrates the existence of at least some unexplained unbilled lines in each of the months analyzed. Moreover, the substance of the Report (charts, graphs, and data) suggests that the number of unexplained unbilled lines is much larger than the Report's conclusion revealed. When tabulating the number of lines that BellSouth should have billed but did not, the Report counted only the unbilled lines that BellSouth could not explain; for the rest, it had, as the district court noted, "assume[d] BellSouth had the better end of the [] interpretive disagreements" over which lines should or should not be billed, *Hamilton II*, 154 F. Supp. 3d at 694 n.23, thereby omitting all the unbilled lines for which BellSouth offered an explanation. Admittedly, this approach was clearly favorable to BellSouth, but that is neither unexpected nor inappropriate in that this was not an impartial investigation; it was BellSouth's Report prepared by BellSouth's paid expert. But the Districts argue that, even in its partisan form, the data not only fails to support the Report's conclusion (i.e., 99.4% of lines properly billed, 100.26% of charges properly remitted), but so clearly contradicts it as to show its "obvious falsity." Specifically, the Report contains charts and graphs that depict thousands of unexplained unbilled lines in each of the five data sets (months) from prior to March 2011, the

month when BellSouth changed its billing system.[12]  The differences in the data from before and after March 2011 are stark.  *See*, *e.g.*, R. 271-11 at p. 4, ¶11 and p. 15, Fig. 1 (chart summarizing the data collected for and presented in the Report).  The Districts contend that these five months are representative of the 112 months before BellSouth changed its billing system (November 2001 to February 2011), which would mean a massive quantity of unexplained unbilled lines.

We agree with the Districts that, at least for the purpose of summary judgment, they have identified a genuine dispute of material fact concerning their TFCA claim for the unexplained unbilled lines.  The Districts survive summary judgment on this issue.

**4.  Bad Faith.**  The TFCA imposes liability on a defendant who "*[k]nowingly* makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or to any political subdivision," T.C.A. § 4-18-103(a)(7) (emphasis added), and defines "knowingly" as "any of the following":

(i) Has actual knowledge of the information;
(ii) Acts in deliberate ignorance of the truth or falsity of the information; or
(iii) Acts in reckless disregard of the truth or falsity of the information.
Proof of specific intent to defraud is not required.

T.C.A. § 4-18-102(2)(A) & (B).  That the section concludes with "[p]roof of specific intent *to defraud* is not required" (emphasis added), is significant; it means that knowing the truth and withholding it is enough.  In other words, this is not a fraud action, this is a simple misrepresentation action.  This is, of course, consistent with possibilities (ii) and (iii), "deliberate ignorance" and "reckless disregard of the truth," respectively.

The district court began by accurately reciting the elements of a false claim, which can be paraphrased for our purposes as: (1) a statement that conceals a duty to pay the government; (2) the statement was objectively false; (3) the defendant knew the statement was false; and (4) the statement was contemporaneous with the duty.  *See Hamilton II*, 154 F. Supp. 3d at 696.

---

[12]The Report selected eleven data sets (months) from the pool of 120; five from before the change in billing practices and six from after.

After reiterating the elements, with supporting citation, the court turned to "intent," an aspect absent from those four elements, and said:

> Although the TFCA does not require proof of specific intent,[13] neither errors based simply on faulty calculations[,] flawed reasoning[,] imprecise statements[,] or differences in interpretation growing out of a disputed legal question are false under the TFCA.[14]  'Where there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are *in good faith*, the claimant cannot be said to have knowingly presented a false claim.' *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003). . . .
>
> The Districts' evidence must at least show that BellSouth's reading is so unreasonable that the arguments could not have been made *in good faith* and thus no 'legitimate grounds for disagreement' existed.  *Southland*, 326 F.3d at 684.

*Hamilton II*, 154 F. Supp. 3d at 697 (editorial marks, some quotation marks, and certain citations omitted; emphasis added).  The *Southland* opinion, relied upon (twice) in the foregoing passage, was a concurring opinion to a Fifth Circuit *en banc* decision.  *See Southland*, 326 F.3d at 677-84

---

[13]This statement cited T.C.A. § 4–18–102(2)(B), but omitted "to defraud" from the actual passage, which —as just quoted in the foregoing paragraph—says: "Proof of specific intent *to defraud* is not required."

[14]The district court cited, among others, *U.S. ex rel. Swafford v. Borgess Medical Center*, 24 F. App'x. 491, 491 (6th Cir. 2001) (per curiam), for the parenthetical quote: "Disputes as to the interpretation of regulations do not implicate False Claims Act liability."  In an associated parenthetical, the district court emphasized that *Swafford* cited, with approval, *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996).  The Eastern District of Tennessee had previously considered this assertion and countered that "*Hagood* does not stand for the proposition that a defendant's reasonable interpretation of a regulation precludes falsity under the FCA":

> The defendants' main argument is that a claim is not false under the FCA if there is any reasonable interpretation of the statute or regulation under which the claim would be true. Where the issue of truth or falsity of a particular statement turns on the meaning and interpretation of a regulation, defendants contend the statement is not 'false' for purposes of the FCA unless it is false under all reasonable interpretations. Defendants rely primarily upon *Hagood* . . . .
>
> The defendants' reliance on *Hagood*, 81 F.3d at 1477, and this line of precedent is misplaced. The [c]ourt instead follows the Ninth Circuit's more recent decision in *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999), *cert. denied*, 530 U.S. 1228 (2000). In *Oliver*, the Ninth Circuit discusses its prior opinion in *Hagood* and rejects the same argument being raised here by the defendants with regard to the 'reasonable interpretation' approach to falsity. *Oliver* . . . explains that *Hagood* does not stand for the proposition that a defendant's reasonable interpretation of a regulation precludes falsity under the FCA. . . . *Oliver* recognizes there is a critical distinction where the regulations involved are discretionary. *Oliver* holds that where technical and complex administrative regulations are not discretionary, their meaning is ultimately a matter of judicial interpretation. It is the defendant's compliance or lack of compliance with the nondiscretionary regulations, as interpreted by the courts, that determines whether the defendant's conduct results in the submission of false claims under the FCA.

*United States v. Estate of Rogers*, No. 1:97CV461, 2001 WL 818160, at *4 (E.D. Tenn., June 28, 2001) (citations omitted). We conclude that *Hagood* is of questionable authority.

(Jones, J., concurring). The *Southland* majority made no mention of good faith and even the cited concurrence mentions it only this once, in passing, without any analysis or further consideration.[15] Even if this assertion is correct, this one lonely sentence of dicta hardly appears sufficient to justify the inclusion of a good faith defense in an action where it does not otherwise appear and arguably might have been specifically excluded by the statute.

But the district court went further and transformed *Southland*'s good-faith defense into a requirement that the Districts must demonstrate that BellSouth acted in "bad faith," analyzing individually each of BellSouth's interpretations for the different types of lines and concluding for each that the Districts had not shown "bad faith." *Hamilton II*, 154 F. Supp. 3d at 698 (for the 100-Line Cap: "No evidence has been produced that supports an inference of bad faith on the part of BellSouth."); *id.* at 698 (for the Centrex Lines: "BellSouth's interpretation is not so unreasonable as to give rise to an inference of bad faith."); *id.* at 700 (for the Multiplex Lines: "The above undisputed facts tell a familiar story of an interpretive dispute and simply do not show that BellSouth acted unreasonably or in bad faith."); *id.* at 700 (for the Federal Government Lines: "Siding with the Comptroller General of the United States . . . may not always be correct, but at least in this context, it cannot be said to be in bad faith or illegitimate.").

We cannot agree that the TFCA requires the plaintiff to prove that the defendant acted in some form of bad faith, particularly when the statute imposes liability for "deliberate ignorance"

---

[15] BellSouth's primary cite in its brief (and only other cite) for this proposition is *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999), which cites as its only authority *Hagood*. *See* note 14, *supra*.

The Amicus Chamber of Commerce cites four out-of-circuit opinions, but its lead citation does not actually support the proposition that an objectively reasonable interpretation of a statute necessarily disproves falsity:

> [The defendant argues] that a defendant cannot be held liable under the FCA so long as it has an objectively reasonable interpretation of an ambiguous [statutory] provision. . . . But this court, looking to Supreme Court guidance, has held that a jury might still find knowledge if there is interpretive guidance that might have warned the defendant away from the view it took. In other words, *even if the [provision] is ambiguous and [the defendant]'s interpretation is reasonable, there remains the question whether [the defendant] had been warned away from that interpretation.* That question cannot readily be labeled as a purely legal question. Consequently, [the defendant] cannot prevail on the basis that the issue of knowledge should never have gone to the jury because it was entitled to summary judgment on a pure question of law.

*U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015) (citations, quotation marks and editorial marks omitted; emphasis added). Therefore, in the D.C. Circuit, an objectively reasonable interpretation of an ambiguous provision, standing alone, is not enough to disprove a False Claim Act claim as a matter of law.

or "reckless disregard for the truth," and in light of its closing admonition that "[p]roof of specific intent to defraud is not required." T.C.A. § 4-18-102(A)(2)(ii)-(iii), (B). Consequently, we conclude that the district court's granting of summary judgment on the basis that the Districts had failed to prove that BellSouth acted in bad faith was in error. While there might be a question as to the availability of this particular good-faith defense—whether reasonable disputes over regulations necessarily protect a defendant from TFCA claims—the Districts have not challenged that in this appeal and we need not decide it now.

**5. "Reasonableness" of BellSouth's Interpretations.** The district court considered BellSouth's statutory interpretation for each type of line and, finding each interpretation reasonable, held that the Districts had not shown the "bad faith" necessary to prove a false claim. *Id.* at 697-701. The Districts contend that these interpretations were unreasonable after-the-fact excuses, or that whether they were reasonable was a disputed question of fact for a jury.

This is actually the crux of the Districts' TFCA-claim appeal. But because the district court misunderstood the Districts' actual TFCA claim, *see* II.B.1 & 2, *supra*, omitted some lines altogether, *see* II.B.3, *supra*, and applied the wrong standard, *see* II.B.4, *supra*, we are confronted with hypothetical rather than concrete questions about the court's assessment of BellSouth's statutory interpretation. Moreover, we are now confronted with a very different dispute from the one that was before the district court. Under a proper construction of the Districts' TFCA claim, considering all the lines, and using a proper standard, BellSouth's statutory-interpretation arguments might be irrelevant, different, or even counterproductive. Consequently, we return this question to the district court to reconsider in light of the totality of this opinion.

### III.

For the foregoing reasons, we REVERSE the judgments of the district court and REMAND for further proceedings consistent with this opinion.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I concur with the majority opinion that there is an implied right of action under the 911 Law and that the Districts' 911 Law and TFCA claims survive summary judgment. However, I write separately to dissent from section II.B of the majority opinion.

The root of my dissent is the axiom, acknowledged by the majority, that "the plaintiff is the master of the complaint and may proceed on its preferred cause of action." *See* Majority Op. at 14; *accord Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). Where I branch off from the majority is the application of this axiom. I believe that it is up to the Districts, not us, to decide whether they "need," Majority Op. at 14, count two of their complaint, breach of fiduciary duty, R. 61 (2d Am. Compl. ¶¶ 112–21) (Page ID #1503–05). The district court, finding no fiduciary relationship among the Districts and BellSouth, dismissed count two. *Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecomms., LLC*, 154 F. Supp. 3d 666, 692 (E.D. Tenn. 2016). The Districts appealed the district court's judgment, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We ought to give them an answer.

Regarding that answer, I believe that there is a genuine issue of material fact on whether BellSouth breached its fiduciary duty to the Districts. Although the 911 Law does not expressly state that telecommunications providers like BellSouth are agents or fiduciaries of the Districts, agency can be implied under Tennessee law. *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009). Whether a principal-agent relationship exists "hinges on the right to control the agent's actions, and, ultimately, the fact of actual control over the agent." *Id.* (citation omitted). In consideration of this standard, the 911 Law conveys to the Districts considerable control over BellSouth; the statute empowers the Districts to set (1) the rate that BellSouth charges its customers, Tenn. Code Ann. § 7-86-108(a)(1)(A),[161] and (2) the date on

---

[1]BellSouth argues that because the Districts cannot charge more than $0.65 for residential customers and $2 for business customers without submitting the charge to a referendum vote or to the county legislature, *see* Tenn.

which BellSouth must begin to bill its customers, *id.* at § 7-86-108(e)(1). The fiduciary question in this case is analogous to *Edwin B. Raskin Co. v. Johnson*, in which a city hired a management company to run a golf course. No. 01-A-01-9708-CH-00392, 1998 WL 242605, at *1 (Tenn. Ct. App. May 15, 1998). In finding a fiduciary relationship, the *Johnson* court noted that the management company was "hired to operate the City's golf course" and that "The City retains control over [the management's] operation, exercising that control first through the City Finance Committee, and then through the Golf Course Commission," which was created "to formulate policies, rules, and regulations, to set rates and fees, and to provide close supervision for the golf course." *Id.* at *3. Similarly, the Districts "set rates and fees" in order to "provide close supervision" over emergency communications. *See id.*; Tenn. Code Ann. §§ 7-86-102(d), 106. Therefore, by the terms of the 911 Law, I believe that a fiduciary relationship exists among the Districts and BellSouth.

The question then becomes whether BellSouth breached its duties under that relationship, as the Districts allege in count two. "An agent is under an obligation to make full and complete disclosure of facts that will benefit his principal and the relationship is treated in the same general manner and with virtually the same strictness as that of trustee and beneficiary." *Marshall v. Sevier Cty.*, 639 S.W.2d 440, 446 (Tenn. Ct. App. 1982). The Districts have put forth evidence from which a reasonable juror could conclude that BellSouth did not make full and complete disclosure of facts that would benefit the Districts. *See* R. 271-17 (Shaffer Dep. at 133) (Page ID #14234) ("Like right now I could not tell you . . . how many lines this company has got. They may be paying Bell for one line. They could be paying Bell for five lines, and Bell's paying me for one. No way I would know."); R. 271-18 (Stuermer Dep. at 135) (Page ID #14245) ("[W]e didn't have access to the information to determine what was going on. So we . . . had to trust the vendors to give us that information and we worked off that information."); R. 271-19 (Deford Dep. at 81–82) (Page ID #14255–56) ("[T]he only information we would have been able to obtain would have been through BellSouth AT&T employees. And they didn't discuss this type of thing or they won't discuss it with you."); R. 271-20 (Coker Dep. at 165)

Code Ann. § 7-86-108(a)(2)(A), their level of control is minimal. *See* Appellee's Br. at 31. While this is certainly a constraint, it does not alter the power dynamic between the Districts and BellSouth. The point is the Districts' position of power relative to BellSouth, not their absolute power and control.

(Page ID #14263) ("When people have called and tried to get information, I do not believe they've got any answers."). Therefore, I would reverse the district court's judgment with respect to count two and remand for further proceedings on that count as well. I concur with the remainder of the majority opinion.